## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOSEPH LUNA,**

**Plaintiff,**

**vs.**                                                          **Civ. No. 15-395  KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

**Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 21), filed September 24, 2015, in support of Plaintiff Joseph Luna's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II childhood disability benefits and Title XVI supplemental security income benefits.  On November 19, 2015, Plaintiff filed his Motion to Reverse and Remand for Rehearing, With Supporting Memorandum ("Motion").  (Docs. 24, 25.)  The Commissioner filed a Response in opposition on February 24, 2016 (Doc. 29), and Plaintiff filed a Reply on March 21, 2016.  (Doc. 30.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**[2]

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 7, 12, 13.)

[2] The Court is remanding this matter for additional administrative proceedings.  *See* Section IV.D., *infra*.

## I. Background and Procedural Record

Claimant Joseph Luna ("Mr. Luna") was initially found eligible as a child for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382(a)(3). (Tr. 42.) Mr. Luna's SSI benefits were discontinued when he turned 18. (Tr. 42, 474.) Mr. Luna alleges here that he became disabled on May 18, 2012,[3] at the age of nineteen, because of "3150,[4] mental retardation, learning disabilities, depression, and chronic headaches." (Doc. 25 at 3, Tr. 232.[5]) Mr. Luna graduated from high school in 2011 and has no past relevant work history.[6] (Tr. 30.)

On May 13, 2011,[7] Mr. Luna filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. (Tr. 191-92.) This application was denied on October 5, 2011. (Tr. 90, 103, 112.) On January 5, 2012, Mr. Luna then protectively filed[8] an application for childhood disability benefits ("CDB") under Title II, based on a parent's Social Security earnings. (Tr. 228-37.) Mr. Luna's

---

[3] Mr. Luna represents in his Motion an alleged onset date of May 18, 2012. (Doc. 25 at 3.) However, Mr. Luna initially alleged onset dates of July 4, 1993, and August 1, 2011. (Tr. 191, 228.) Additionally, on February 8, 2013, attorney Barbara Jarvis filed a Motion to Amend Onset Date and Reopen Claim and represented that Mr. Luna was only making an SSI claim, and that he wanted to amend his alleged onset date of May 3, 2011. (Tr. 144.)

[4] Developmental and emotional disorders of newborn younger infants. *See* POMS DI 26510.015.G.3. (The POMS (Program Operations Manual Systems) is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999)).

[5] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 21) that was lodged with the Court on September 24, 2015.

[6] Mr. Luna worked part-time as a dishwasher for a fast food restaurant for approximately four months in 2010, and part-time as a hotel porter beginning in March 2013. (Tr.144, 217, 334, 339.)

[7] Mr. Luna's application is dated May 13, 2011 (Tr. 191-92); however, other sources in the Administrative Record refer to this application as dated May 3, 2011. (Tr. 90, 103, 112.)

[8] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits. The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application. *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

CDB application was initially denied on February 23, 2012. (Tr. 88, 89-98, 121-23.) On March 24, 2012, Mr. Luna requested reconsideration of his "SSI" [sic] application filed under his social security number and his CDB application filed under a parent's social security number. (Tr. 124.) Before there was a decision on his reconsideration, however, Mr. Luna filed an application for SSI benefits on May 24, 2012. (Tr. 194-99.) Mr. Luna's applications were denied at reconsideration on October 23, 2012. (Tr. 100, 101, 102-10, 111-19, 125-27, 128-31.) On December 17, 2012, Mr. Luna requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 134-36.) On February 8, 2013, Attorney Barbara Jarvis submitted a Request for On-The-Record Favorable Decision ("Request") and represented that Mr. Luna was only making an SSI claim and requested his claim be reopened to the original filing date of May 3, 2011, and that his alleged onset date be amended to May 3, 2011. (Tr. 144-55.) The ALJ conducted a hearing on August 8, 2013.[9] (Tr. 38-87.) Mr. Luna appeared in person at the hearing with Ms. Jarvis. (Tr. 40.) The ALJ took testimony from Mr. Luna (Tr. 47-78) and an impartial vocational expert ("VE"), Nicole King. (Tr. 40, 78-86.)

On December 30, 2013, the ALJ issued an unfavorable decision. (Tr. 19-32.) In arriving at her decision, the ALJ determined that Mr. Luna had not attained age 22 nor engaged in substantial gainful activity since his alleged disability onset date of July 4, 1993. (Tr. 24.) The ALJ found that Mr. Luna suffered from severe impairments of a learning disability, attention deficit hyperactivity disorder, depression, and mixed migraines. (*Id.*) The ALJ also determined that Mr. Luna had a non-severe impairment related to his use of marijuana and Spice. (Tr. 25.) However, the ALJ found that these impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*)

---

[9] The ALJ does not reference Ms. Jarvis' Request at the Administrative Hearing. The ALJ also does not reference Ms. Jarvis' Request in her determination. Instead, the ALJ references both Mr. Luna's SSI and CDB applications and an alleged onset date of July 4, 1993. (Tr. 22.)

Because she found that Mr. Luna's impairments did not meet a Listing, the ALJ then went on to assess Mr. Luna's residual functional capacity ("RFC").  The ALJ stated that

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform simple routine tasks with reasoning level one; and can perform jobs not requiring the ability to read instructions, write reports or perform math.

(Tr. 26.)  The ALJ concluded that Mr. Luna had no past relevant work.  (Tr. 30.)  Based on the RFC and the testimony of the VE, the ALJ determined at step five that considering Mr. Luna's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  (Tr. 30-31.)

On March 27, 2015, the Appeals Council issued its decision denying Mr. Luna's request for review and upholding the ALJ's final decision.  (Tr. 1-3.)  On May 7, 2015, Mr. Luna timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

## II.  **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[10] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir.

---

[10] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118.  Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  As such, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the

ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Id.* at 1009-10. Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[11] of presumptively

---

[11] 20 C.F.R. pt. 404, subpt. P. app. 1.

disabling impairments; *or* (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops.  If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. § 404.1545(a)(1)-(3).  This is called the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1545(a)(1) & (a)(3).  The claimant's RFC is used at step four to determine if he can perform the physical and mental demands of his past relevant work.  20 C.F.R. § 404.1520(a)(4), 404.1520(e).  If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v.*

*Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

## IV.  Analysis

Mr. Luna asserts several arguments in support of reversing and remanding his case. Because the Court finds grounds for remand as discussed below, the Court does not specifically analyze all of Mr. Luna's arguments.

### A.    Education and Medical History

#### 1.    Education

Mr. Luna was born prematurely at 28 weeks and suffered oxygen deprivation to his brain. (Tr. 43, 476.)   He was evaluated as an infant by the New Mexico Preschool and Infant Evaluation Program and determined by Albuquerque Public School ("APS") Childfind to meet the eligibility criteria of developmental delay and specific learning disabled.  (Tr. 351-54.) Mr. Luna received special education throughout elementary, middle school and high school. (*Id.*)

On November 18, 2010, Albuquerque Public Schools prepared a final Individualized Education Program ("IEP") when Mr. Luna was in the twelfth grade.  (Tr. 310-32.)  The IEP indicated that Mr. Luna was trying hard in school to get better grades, and that he wanted to graduate from high school.  (Tr. 312.)  It also indicated that Mr. Luna wanted to work after graduation and before he decided about his future education.  (*Id.*)  The IEP reported (1) that Mr. Luna was polite and respectful towards staff and his peers; (2) that he thrived when given the

opportunity to express himself orally; (3) that his oral communication skills were good; (4) that he had excellent critical thinking skills; and (5) that his attendance, behavior, and attitude were excellent.  (*Id.*)  The IEP also reported that Mr. Luna had deficits in (1) his processing speed and working memory; (2) reading; (3) reading comprehension; (4) written expression; and (5) ability to decode and comprehend written information.  (Tr. 312-13.)  His decoding/reading skills were determined to be at the fifth grade level, and his spelling/sentence writing skills were determined to be at the fourth and third grade level.  (Tr. 313.)  Mr. Luna's anticipated graduation date was May 22, 2011.  (Tr. 314.)  Mr. Luna received a provisional graduation diploma because he did not pass the high school competency exam.  (Tr. 59-60.)

In the fall of 2011, Mr. Luna registered with the Disability Resource Center at Central New Mexico Community College ("CNM") and enrolled in three classes.  (Tr. 389.)  On January 3, 2012, LISW Lucy Birbiglia prepared a "To Whom It May Concern" letter and stated that Mr. Luna's disabilities had affected his ability to function in his classes and that he had been unable to pass them even though he attended regularly and did his best to turn in all assignments. (*Id.*)  She indicated that Mr. Luna planned to retake his classes in the Spring 2012 semester, and that intensive tutoring and other accommodations would be made available to him.  (*Id.*)  On January 13, 2012, LISW Birbiglia wrote a second "To Whom It May Concern" letter and stated that Mr. Luna was attending classes.  (Tr. 391.)  On June 18, 2012, LISW Birbiglia wrote a third "To Whom It May Concern" letter addressed to the Social Security Administration and stated that Mr. Luna was a part-time student at CNM, that he had had difficulty with the few courses he had attempted, that his intellectual deficits made school difficult for him, that he did not have the ability or skills to obtain employment, and that he needed his SSI benefits to cover his basic living expenses.  (Tr. 414.)  On August 9, 2012, LISW Birbiglia prepared a Student

Accommodation Statement requesting accommodations on Mr. Luna's behalf that included, *inter alia*, extra time for reading and extended time for test taking and class assignments.  (Tr. 413.) LISW Birbiglia indicated that Mr. Luna's disability affected his learning in situations involving reading, note taking, test taking, and math, but that he was motivated to succeed and had a willingness to work hard in his classes.  (*Id.*)  Despite his efforts and even with accommodations, Mr. Luna did not pass any of his college courses.  (Tr. 51.)

### 2. Medical History

#### a. Mental Impairments

##### (1) John R. Buchan, LISW

John R. Buchan, LISW, first treated Mr. Luna for depression from March 7, 2008 until June 19, 2009.  (Tr. 469-71.)  LISW noted that Mr. Luna had been very depressed and had initially presented with suicidal and homicidal ideation.[12]  (*Id.*)  LISW Buchan's discharge summary stated that Mr. Luna made and maintained very good progress in counseling despite stopping his antidepressant medication after only a few months.  (*Id.*)  He indicated that Mr. Luna was able to verbalize his feelings and discuss sensitive subjects without escalation. (*Id.*)  LISW Buchan noted that Mr. Luna believed his problems with depression were resolved and behind him.  (*Id.*)

On January 5, 2012, LISA Buchan prepared a Crisis Management Plan for Mr. Luna. (Tr. 406.)  LISW Buchan identified steps for Mr. Luna to take when his thoughts became negative and hopeless.  (*Id.*)

On January 11, 2012, LISW Buchan prepared an Outpatient Initial Assessment and Treatment Plan.  (Tr. 473-82.)  Mr. Luna reported that his depression began to reemerge

---

[12] LISW Buchan noted that Mr. Luna was evaluated emergently, but was not admitted due to no beds being available.  (Tr. 469.)  Dr. Cynthia King followed Mr. Luna and started him on antidepressant medication.  (*Id.*)

approximately three months earlier.  (Tr. 474.)  Mr. Luna stated that he was failing his classes at school, and that he and his mother were experiencing significant financial and housing problems. (*Id*.)  Mr. Luna reported feeling increasingly down, negative and hopeless.  (Tr. 480.)  LISW Buchan indicated that Mr. Luna did not appear in any imminent danger to himself or others and appeared to be using coping strategies that he developed in the past.  (*Id.*)  He noted that Mr. Luna seemed to be very open and motivated to participate in counseling.  (*Id*.)  LISW Buchan assessed Mr. Luna with major depressive episode, recurrent moderate.  (*Id*.)

Mr. Luna had twenty individual counseling sessions with LISW Buchan from November 2, 2012 through July 17, 2013.  (Tr. 486-87, 491-92, 493-94, 507-08, 509-10, 511-12, 513-14, 515-16, 519-20, 523-24, 525-26, 527-28, 531-32, 533-34, 536-37, 538-39, 540-41, 545-46, 547-48, 549-50.)  Mr. Luna's counseling sessions focused primarily on his concerns about finances, his goals for obtaining and maintaining employment, and his relationships with his family and girlfriend.  (*Id.*)

On January 16, 2013, LISW Buchan prepared a Questionnaire that included his assessment of Mr. Luna using Listings 12.02 – *Organic Mental Disorder* and 12.04 – *Affective Disorder*.  (Tr. 500-505.)  LISW Buchan assessed that Mr. Luna met the "A" criteria of both listings, and also met the "B" criteria because Mr. Luna demonstrated marked difficulties in maintaining concentration, persistence or pace, and had experienced four or more episodes of decompensation in the previous year.  (Tr. 503.)  LISW Buchan also prepared a Mental Residual Functional Capacity Assessment in which he assessed, *inter alia*, that Mr. Luna was markedly limited in his ability to understand and remember, and in his ability to sustain concentration and persistence.  (Tr. 504.)

(2)     **Cynthia Y. King, M.D.**

On November 1, 2012, Mr. Luna saw Cynthia Y. King, M.D., at UNM Behavioral Health.  (Tr. 488-90.)  Mr. Luna complained of depression that was exacerbated by his headaches.  (*Id.*)  Dr. King diagnosed major depressive episode, recurrent, severe without psychotic features.  (*Id.*)  Dr. King prescribed Fluoxetine and instructed Mr. Luna to continue individual therapy with LISW Buchan.  (*Id.*)

On December 3, 2012, Mr. Luna saw Dr. King and reported that his mood was improved, that he felt more hopeful, the he had improved energy, an improved appetite, and improved sleep.  (Tr. 495.)  Dr. King continued Fluoxetine and instructed Mr. Luna to continue individual therapy with LISW Buchan.  (Tr. 496.)

(3)     **Barbara A. May-Valencia, Ph.D.**

On September 9, 2011, Barbara A. May-Valencia, Ph.D., performed a comprehensive mental status examination on behalf of the Disability Determination Services.  (Tr. 359-66.)  Mr. Luna reported a history of depression "about 4 years ago," a history of ADHD diagnosed in grade school, and that he had been diagnosed with hypertension approximately one year earlier.  (Tr. 359.)  Mr. Luna stated he was unable to read or write well, but that he had graduated from Rio Grande High School and was currently studying basic courses at CNM and wished to study computers.  (*Id.*)  Mr. Luna said he spent his time going to school, hanging out with his friends, and attending dance class.  (*Id.*)  Mr. Luna said he was working at the Journal Pavilion to raise money for La Baila! and was going to London, England to dance for the Olympics.  (*Id.*)  (Tr. 359.)

Dr. May-Valencia administered the Wechsler Adult Intelligence Scale—Fourth Edition ("WAIS-IV") to measure Mr. Luna's cognitive ability.  (Tr. 361-66.)  Based on Mr. Luna's test

results, Dr. May-Valencia assessed, *inter alia*, that Mr. Luna's general cognitive ability was within the low average range of intellectual functioning, but that his overall thinking and reasoning abilities exceeded those of approximately 21% of individuals his age.  (Tr. 361.)  She assessed that Mr. Luna performed much better on verbal than on nonverbal reasoning tasks, that his verbal reasoning abilities were in the average range and above those of approximately 50% of his peers, and that his ability to process simple or routine visual material without making errors was in the average range when compared to his peers.  (Tr. 361, 363.)  She also assessed that Mr. Luna's ability to sustain attention, concentrate, and exert mental control was in the borderline range.  (Tr. 362.)

Dr. May-Valencia's diagnostic impression was as follows:

| | |
|---|---|
| Axis I - | History of ADHD 314.9 |
| | History of Learning Disorder NOS  315.9 |
| Axis II - | None |
| Axis III - | Hypertension |
| Axis IV - | Academic, occupational, financial, access to medical care |
| Axis V - | 46 |

(Tr. 360.)  She summarized that

Joseph is an 18 year old high school graduate who is functioning within the low average cognitive range.  He denies any mental health symptoms.  He does have a history of hypertension and needs to have regular medical followup.  He should continue to attend CNM college for study in computer science.  He is involved in volunteer activities and should be encouraged to continue this.  It appears that he has been able to overcome problems in learning and attention over the years; however his working memory index is in the borderline range.  He appeared to put forth full effort in the evaluation and the results appear valid.  He appears capable of interacting appropriately in an employment setting including following basic instructions and getting along with the general public, peers and supervisors. He is capable of managing his own benefits.

(*Id.*)

b. **Headaches**

On February 16, 2011, Mr. Luna presented to ABQ Health Partners and complained of a bad frontal headache for two weeks.  (Tr. 383.)  He reported that he had vomited that day and the headache resolved.  (*Id.*)  Mr. Luna denied any blurred vision, nausea, or shortness of breath.  (*Id.*)  CFNP Carol Scott assessed hypertension, prescribed Lisinopril, instructed Mr. Luna to reduce his salt intake, and advised him to follow up with his primary care provider to obtain lab work.  (*Id.*)

On June 16, 2011, Mr. Luna presented to ABQ Health Partners and complained of a headache off and on for about one week.  (Tr. 382.)  He reported no lightheadedness and no nausea or vomiting.  (*Id.*)  PAC Meghan Blum assessed headache and hypertension, prescribed Ibuprofen for pain, instructed Mr. Luna to continue with Lisinopril, and advised him to follow up with his primary care provider.  (*Id.*)

On June 20, 2011, Mr. Luna saw Lance A. Chilton, M.D., at the University of New Mexico Young Children's Health Center and reported headaches off and on for the previous two weeks.  (Tr. 399.)  He stated that they usually go away with Ibuprofen.  (*Id.*)  Mr. Luna reported some nausea, but no vomiting, no aura, and no other neurologic symptoms.  (*Id.*)  Dr. Chilton assessed probable migraine and instructed Mr. Luna to take 600 mg. of Ibuprofen at the onset of his headaches and return if they became more frequent.  (*Id.*)

On December 29, 2011, Mr. Luna presented to ABQ Health Partners and complained of headaches occurring for several months.  (Tr. 374-76.)  He stated that his symptoms had worsened with stress, from not doing well in school, and from feeling more depressed.  (Tr. 375.)  Mr. Luna's physical exam was normal, and Peter Koenigsberg, M.D., assessed major depression,

single episode, without psychotic features, with melancholia.  (Tr. 376.)  Dr. Koenigsberg recommended that Mr. Luna schedule an appointment with a psychologist.  (*Id.*)

On January 7, 2012, Mr. Luna returned to Dr. Chilton and reported having one to two headaches per day.  (Tr. 397.)  Mr. Luna reported no vomiting and no visual symptoms.  (*Id.*)  Dr. Chilton increased Mr. Luna's antidepressant medication, Amitriptyline, from 10 to 25 milligrams once daily.  (*Id.*)  Dr. Chilton also instructed Mr. Luna to keep a headache diary. (*Id.*)

On January 9, 2012, Mr. Luna saw Dr. Chilton and reported a severe headache.  (Tr. 395.)  Mr. Luna reported he took Ibuprofen and was considerably better.  (*Id.*)  Dr. Chilton assessed migraine and/or tension headaches.  (*Id.*)  Dr. Chilton noted that Mr. Luna had misidentified his original dose of Amitriptyline, which was actually 25 mg.  (Tr. 395, 397.)  Mr. Luna reported no good or bad effects from the medication so far.  (Tr. 395.)  Dr. Chilton increased Amitriptyline dose to 50 milligrams once daily.  (*Id.*)

On January 31, 2012, Mr. Luna saw Dr. Chilton and reported continued severe headaches.  (Tr. 454.)  Mr. Luna stated it was taking a while for the Ibuprofen to work.  (*Id.*)  Mr. Luna reported running out of Lisinopril and Amitryptiline.  (*Id.*)  Dr. Chilton assessed severe headaches, possibly migraine.  (*Id.*)  He refilled Mr. Luna's prescriptions for Lisinopril and Amitryptiline, and prescribed Sumatriptan to use at the onset of his headaches.  (*Id.*)

On February 7, 2012, Mr. Luna returned for follow up with Dr. Chilton.  (Tr. 451.)  Dr. Chilton noted that the Sumatriptan seemed to have made a good deal of difference for Mr. Luna's headaches.  (*Id.*)  Mr. Luna reported no side effects from the medication.  (*Id.*)  Dr. Chilton referred Mr. Luna for a neurology consult due to the frequency of his headaches.  (Tr. 450-51.)

On February 24, 2012, Mr. Luna saw Rachel Rodriguez-Marzec, CFNP, regarding his headaches.  (Tr. 449.)  Mr. Luna reported having four migraines each week.  (*Id*.)  He stated that Ibuprofen takes approximately one hour to take effect, but relieves the pain completely.  (*Id*.)  CFNP Rodriguez-Marzec attempted to expedite an appointment with neurology and encouraged Mr. Luna to make lifestyle changes, such as decreasing his intake of foods with preservatives and increasing his water intake.  (*Id*.)

On March 6, 2012, Mr. Luna saw Dr. Chilton to discuss his headaches and medications.  (Tr. 446.)  Dr. Chilton noted that Ibuprofen was still useful.  (*Id*.)

On June 13, 2012, Neurologist Bruce Jeffrey Fisch, M.D., of UNM Health Sciences Center, evaluated Mr. Luna for headaches and/or migraine headaches.  (Tr. 429-34.)  Based on Mr. Luna's reported history and Dr. Fisch's physical exam, Dr. Fisch assessed that Mr. Luna "may have mixed type of migraine headache in addition with possibly an analgesic or medication overuse headache due to his daily use of ibuprofen."  (Tr. 432.)  Dr. Fisch recommended prophylactic and preventive treatment to decrease the frequency of Mr. Luna's headaches.  (*Id*.)  Dr. Fisch recommended, *inter alia*, certain medication adjustments; that Mr. Luna should avoid Spice, marijuana and tobacco; that Mr. Luna should increase his water intake and decrease his soda and caffeine intake; that Mr. Luna should exercise and improve his diet; and that he should keep a  headache diary to determine any migraine triggers.  (Tr. 432-33.)

On June 27, 2012, Neuroradiologist Stephen Gutu, M.D., of UNM Medical Center Neurodiagnostic Laboratory, evaluated Mr. Luna to rule out seizures.   (Tr. 427-28.)  Neurodiagnostic studies were unremarkable.  (*Id.*)

 On April 24, 2013, Mr. Luna saw Dr. Chilton for follow up on forms and his medications.  (Tr. 521.)  He reported at that time that he was taking 800-1200 milligrams of

16

Ibuprofen before each headache and that his headaches had been better. (*Id.*) Dr. Chilton assessed that Mr. Luna's chronic headaches were stable or somewhat better. (*Id.*)

### B.    New and Material Evidence

Mr. Luna attached to his Motion a Questionnaire completed by his treating psychiatrist, Cynthia King, M.D., and dated February 24, 2014. (Doc. 25, Ex. A.) The Questionnaire included Dr. King's assessment of Mr. Luna's mental impairments based on Listing 12.02 – *Organic Mental Disorder* and Listing 12.04 – *Affective Disorder*. (*Id.*) Dr. King assessed that Mr. Luna met the requirements of both listings. (*Id.*) Mr. Luna argues that Dr. King's assessment constitutes new and material evidence and justifies remand. (Doc. 25 at 6.) The Commissioner argues that Dr. King's assessment is not material to this case because it is about a time period during which she did not treat Mr. Luna, and because Mr. Luna has failed to show good cause for his failure to submit this evidence during the prior proceedings. (Doc. 29 at 4-5.)

Sentence six of 42 U.S.C. § 405(g) authorizes a district court to remand to the agency when "new and material evidence comes to light, and there is good cause for failing to incorporate such evidence in the earlier proceeding." *Nguyen v. Shalala*, 43 F.3d 1400, 1403 (10th Cir. 1994). Under § 405(g)

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

*Wilson v. Astrue*, 602 F.3d 1136, 1148 (10th Cir. 2010) (quoting 42 U.S.C. § 405(g)). Evidence is material if "'the Secretary's decision might reasonably have been different had the [new] evidence been before h[er] when h[er] decision was rendered.'" *Wilson*, 602 F.3d at 1148 (quoting *Cagle v. Califano*, 638 F.2d 219, 221 (10th Cir. 1981) (internal quotation omitted)); *see also Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (evidence is new if it is not

duplicative or cumulative, and is material if there is a reasonable possibility it could change the outcome).

The Court need not consider whether the evidence submitted is new and material because Mr. Luna has not established good cause for his failure to submit Dr. King's assessment during the prior proceedings.  When a claimant submits new evidence for the first time to the court, he must also establish good cause for the failure to incorporate such evidence into the record in a prior proceeding.  *Wilson*, 602 F.3d at 1148.  Mr. Luna has not done so here.  *See* 20 C.F.R. §§ 404.911, 416.1411 (describing circumstances where good cause may exist; *i.e.,* serious illness or death, records were destroyed or damaged, trying very hard to obtain information but unable to do so, or unusual circumstances).  The Administrative Hearing was held on August 8, 2013. (Tr. 38-87.)  The ALJ rendered her determination on December 30, 2013.  (Tr. 19-32.)  Mr. Luna filed his Request for Review of Hearing Decision on February 25, 2014.  (Tr. 8.)  Dr. King's assessment is dated February 27, 2014.  (Doc. 25, Ex. A.)  The Appeals Council denied review on March 27, 2015.  (Tr. 1-3.)  Mr. Luna initially explained in his Motion that "Dr. King had been unable to complete a questionnaire prior to the hearing."  (Doc. 25 at 6.)  This, without more, is insufficient.  Further, even assuming *arguendo* that this could establish good cause, Mr. Luna's initial explanation does not account for why Dr. King's assessment was not submitted to the Appeals Council.  That said, Mr. Luna further explained in his Reply that (1) he had lost contact with Dr. King, and (2) that he did not submit Dr. King's assessment to the Appeals Council because it was not completed until after his appeal had already been filed. (Doc. 30 at 2.)  This is equally insufficient.  First, the record indicates that Dr. King actively managed Mr. Luna's psychopharmacology as late as May 14, 2013 – two years into the pendency of Mr. Luna's claim, four months before the administrative hearing was held, and eight

months before the ALJ's determination was issued.  (Tr. 19-32, 36-87, 191-92, 517.)  As such, there was sufficient opportunity to obtain an assessment from Dr. King during the pendency of Mr. Luna's claim.  Second, Dr. King's assessment is dated February 27, 2014, only *two days* after Mr. Luna requested a review of the hearing decision.  Additional evidence may be submitted out of time with written permission.  *See* SSA Form HA-520 (Tr. 8) (providing instructions to request an extension of time for submitting additional evidence).  Moreover, the Appeals Council did not render a decision for *thirteen months* after Mr. Luna requested review. (Tr. 1-3.)  Although the precise timing of the Appeals Council's decision was certainly unknown at the time Mr. Luna requested review, the Court is not persuaded that Mr. Luna was foreclosed from submitting additional evidence a mere two days after filing his request for review, particularly when the regulations and Tenth Circuit case law require the Appeals Council to consider new and material evidence that relates to the relevant time period.  20 C.F.R. §§ 404.970(b), 416.470(b); *see also Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011) (stating the well-established principle that the Appeals Council must consider additional evidence offered on administrative review if it is new, material, and chronologically pertinent). Finally, Mr. Luna was represented by present counsel for eight months *before* the Administrative Hearing occurred.[13]   "[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored."  *Wilson*, 602 F.3d at 1149 (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997)).  "Allowing a claimant to hold opinion evidence as to h[is] limitations to present to the district court in the first instance would seriously undermine the regularity of the agency process and is not allowed."  *Wilson*, 602 F.3d at 1149.

---

[13] Ms. Jarvis began representing Mr. Luna on December 11, 2012.  (Tr. 132-33.)

For the foregoing reasons, the Court finds that Mr. Luna has failed to show why he could not have obtained and submitted Dr. King's assessment to the ALJ or, at the least, to the Appeals Council.   Having failed to establish good cause, remand on this basis is not authorized. 42 U.S.C. 405(g).

    **C.**    **RFC Assessment**

Mr. Luna argues that the ALJ's RFC failed to include any limitations imposed by conditions that she herself concluded were severe at step two and that it is not supported by substantial evidence.   Specifically, Mr. Luna argues that the ALJ failed to impose limitations related to his concentration, his migraines and his depression.   As a result, Mr. Luna argues that the ALJ's hypothetical question to the VE is not supported by substantial evidence.

As an initial matter, Mr. Luna's argument that finding an impairment at step two should automatically result in a limitation at steps four and five is misplaced.   At step two, an ALJ considers the medical severity of a claimant's impairments.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   An ALJ's findings at step two require only a "de minimis" showing of impairment.   *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997); *see also Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988) (stating that if a claimant is able to show that his impairment would have more than a minimal effect on his ability to do basic work activity he has made a *de minimus* showing).   When a claimant's impairments do not meet or equal in severity the requirements of any impairments in the Listings, as is the case here, the ALJ uses her step two findings as a basis for her step four and five findings.   SSR 96-8p, 1996 WL 374184, at *2 (instructing that an adjudicator must consider only limitations and restrictions attributable to medically determinable impairments).   Thus, whether an identified impairment causes physical

or mental limitations or restrictions that affect a claimant's capacity to do work-related physical and mental activities at steps four and five is an entirely separate and different analysis.

RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, may cause physical or mental limitations or restrictions that may affect his capacity to do work-related physical and medical activities. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184, at *2. In determining a claimant's RFC, the ALJ should first assess the nature and extent of the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(b) and (c), 416.945(b) and (c). The ALJ is required to consider all of the claimant's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *see also Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010). "[T]he ALJ must make specific findings," *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996), that are "supported by substantial evidence." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p, 1996 WL 374184, at *7.

Mr. Luna argues that the ALJ's RFC should have included greater limitations related to, *inter alia*, his ability to concentrate. (Doc. 25 at 14-16.) Specifically, he contends that the evidence supports he has marked limitations in concentration, persistence, and pace because both LISW Buchan and Dr. King[14] assessed that he was markedly limited, and because Dr. May-Valencia assessed that his ability to sustain attention and concentration was in the borderline range. (*Id.*) For the reasons discussed below, the Court finds that the ALJ failed to apply the

---

[14] Dr. King's assessment is not a part of the record and the Court will not consider her assessment in determining whether substantial evidence supports the ALJ's findings. *See* Section IV.B., *supra*.

correct legal standards in assessing Mr. Luna's RFC as to his limitations in concentration, persistence and pace.[15]

### 1.  <u>Dr. May-Valencia</u>

The ALJ failed to explain why she adopted portions of Dr. May-Valencia's opinion while not relying upon or altogether rejecting others.  "An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).  The ALJ accorded "greater" weight to Dr. May-Valencia's opinion (Tr. 30), but failed to address Dr. May-Valencia's findings regarding Mr. Luna's working memory index, and specifically that his "ability to sustain attention, concentrate, and exert mental control is in the borderline range" and that he only performed better than approximately 6% of his peers in this area.  (Tr. 360, 362.) Dr. May-Valencia explained that

> Joseph's abilities to sustain attention, concentrate, and exert mental control are a weakness relative to his verbal reasoning abilities.  A weakness in mental control may make the processing of complex information more time-consuming for Joseph, draining his mental energies more quickly as compared to others at his level of ability, and perhaps result in more frequent errors on a variety of learning or complex work tasks.  Joseph's difficulties in school involving School-Related difficulties and Physical difficulties may be related to this weakness in mental control.  Joseph had difficulty with the two tasks that demand mental control, that is, attending and holding information in short-term memory while performing some operation or manipulation with it and then correctly producing the transformed information[.]

(Tr. 362.)   This portion of Dr. May-Valencia's opinion bears directly on limitations in concentration, persistence, and pace, yet the ALJ ignored, if not altogether rejected these

---

[15] Because the Court finds reversible error requiring remand as to this issue, the Court does not address Mr. Luna's other arguments including those regarding his headaches or depression.

findings.[16]   The ALJ's silence as to these findings is significant because she rejected other probative evidence that arguably supports a finding of *marked* limitations in concentration, persistence and pace on the grounds that it was "inconsistent with the weight of the evidence." *See* Section IV.C.2., *infra*.   To the contrary, Dr. May-Valencia's findings as to Mr. Luna's working memory seem to support LISW Buchan's assessment of marked limitations in this area. Therefore, had the ALJ properly considered this portion of Dr. May-Valencia's opinion, she may not have rejected LISW Buchan's assessment, but appropriately found that it was more *consistent* rather than *inconsistent* with the weight of the evidence.

### 2.      LISW Buchan

The ALJ failed to apply the correct legal standard in considering LISW Buchan's opinion.  *See* SSR 06-03p, 2006 WL 2329939 (clarifying how opinions from sources who are not "acceptable medical sources" are considered).   LISW Buchan assessed that Mr. Luna had *marked* difficulties in maintaining concentration, persistence or pace.  (Tr. 503.)  LISW Buchan further assessed that Mr. Luna had *marked* limitations in (1) his ability to remember locations and work-like procedures; (2) his ability to understand and remember detailed instructions; (3) his ability to carry out detailed instructions;  (4) his ability to maintain attention and concentration for extended periods;  (5) his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (6) his ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

---

[16] The Commissioner's reliance on Dr. May-Valencia's statement that Plaintiff should be capable of interacting appropriately in an employment setting, including following basic instructions and getting along with others, as probative of, or somehow negating, the extent of Mr. Luna's limitations in concentration, persistence and pace is misplaced.  Mr. Luna's ability to interact appropriately, get along, and follow basic instructions does not address, much less establish the degree of limitation he has in his ability to sustain concentration, persist in a job eight hours a day five days per week, or pace himself at an acceptable level.  On the other hand, the portion of Dr. May-Valencia's opinion, ignored by the ALJ, that he is in the borderline range in his ability to sustain attention, concentrate, and exert mental control bears directly on the aforementioned limitations.

periods.  (Tr. 504.)  Claiming to give Dr. Buchan's opinion "appropriate weight as a third party opinion," but "not giv[ing] any significant weight" to the opinion, the ALJ effectively rejected Dr. Buchan's opinion as "extreme and inconsistent with the weight of the evidence." (Tr. 30.) The ALJ's stated reasons for rejecting Dr. Buchan's significantly probative opinion are inadequate, not supported by substantial evidence, and insufficiently specific to permit meaningful review.

The regulations contemplate the use of information from "other sources," both medical and non-medical, in making a determination about whether an individual is disabled.  *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)).  Recognizing the growth of managed health care in recent years and the increasing use of medical sources who are not technically "acceptable medical sources," SSR 06-03p states that

> medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinion from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3.  Thus, evidence from other medical sources[17] and non-medical sources[18] may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function."  *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at

---

[17] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist.  SSR 06-03p, 2006 WL 2329939, at *2.

[18] Non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers.  SSR 06-03p, 2006 WL 2329939, at *2.

*2.  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an 'acceptable medical source'[19] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2.

An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). Although opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity cannot be given controlling weight, an adjudicator may determine that opinions from such sources are entitled to greater weight than a treating source medical opinion.  SSR 06-03p, 2006 WL 2329939, at *6.  The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion.  SSR 06-03p, 2006 WL 2329939, at *4-5.

---

[19] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  SSR 06-03p, 2006 WL 2329939, at *1.

The ALJ failed to apply the appropriate factors in considering and weighing LISW Buchan's opinion.  The medical record evidence supports that LISW Buchan assumed the greater percentage of Mr. Luna's mental health treatment for extended periods of time.  *See* Section IV.A.2.a.(1), *supra*.  As such, his findings and opinion – that Mr. Luna had marked difficulties in maintaining concentration, persistence or pace - was significant and should have been properly considered to determine the severity of and the impact on Mr. Luna's ability to perform non-physical work activities.   *See* SSR 06-03p, 2006 WL 2329939, at *3.   LISW Buchan's assessment was also consistent with Dr. May-Valencia's opinion that Mr. Luna's short term memory is poor and his ability to sustain attention, concentrate, and exert mental control is in the borderline range.  (Tr. 360, 362.)   Significantly, LISW Buchan's assessment was also consistent with the testimony of Mr. Luna's employment supervisor, Jason Paz, who witnessed Mr. Luna's limitations first hand in an actual work setting.   Finally, LISW Buchan's treatment records and notes presented relevant evidence and supported his findings and opinion based on his observations and treatment relationship with Mr. Luna.  *See* Section IV.A.2.a.(1), *supra*.  These factors, and the weight of the evidence support according more, not less weight to LISW Buchan's opinion.

The ALJ failed to properly consider and weigh LISW Buchan's opinion pursuant to SSR 06-03p, and her basis for rejecting the opinion is not supported by substantial evidence.  This is reversible error.

### 3.    <u>Jason Paz</u>

The ALJ failed to apply the correct legal standards when she completely ignored the affidavit of Mr. Luna's employment supervisor, Mr. Jason Paz, who provided some of the most probative evidence of Mr. Luna's limitations in an actual work setting.  Regulations state that all

relevant evidence will be considered when making a determination about whether an individual is disabled.  20 C.F.R. § 416.927(b).  Evidence from non-medical sources may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function."   SSR 06-03p, 2006 WL 2329939, at *2.  The Commissioner concedes that the ALJ failed to discuss Mr. Paz's statement, but argues it was an "inadvertent oversight," harmless, and does not constitute reversible error.  (Doc. 29 at 11.)  The Commissioner contends that Mr. Paz testified only as Mr. Luna's cousin, that his testimony reiterated Mr. Luna's subjective complaints, and that the same evidence the ALJ relied on to find Mr. Luna not credible would equally apply to Mr. Paz's testimony.  (*Id.*)  The Court disagrees.

The ALJ ignored relevant evidence.  Mr. Paz's sworn testimony was in his role as the assistant manager at Extended Stay America who supervised Mr. Luna's part-time "porter" job. (Tr. 339.)  While Mr. Paz openly acknowledged his familial relationship with Mr. Luna and indicated that he had hired him despite his "learning problems," and believed that Mr. Luna would not have even successfully obtained this part-time work if it had not been for the familial connection (*id.*), it is beyond dispute that theirs was a bona fide employer-employee relationship. Thus, in his capacity as Mr. Luna's employment supervisor, Mr. Paz testified (1) that Mr. Luna worked five hours per day on Saturdays and Sundays;[20] (2) that his duties included picking up trash on the hotel premises, gathering linens from housekeepers, and cleaning the stairwells, hallways, elevators and the laundry room; (3) that Mr. Paz gave Mr. Luna a list of tasks, but that Mr. Luna often did not complete the items on the list and had to be given frequent reminders of the tasks to be completed; (4) that Mr. Luna often either failed to complete tasks he had started or if completed, did so at a slower than normal pace; and (5) that he did not believe Mr. Luna

---

[20] The ALJ incorrectly represented that Mr. Luna worked two twelve-hour shifts.  (Tr. 26.)  If the ALJ believed that Mr. Luna had worked two twelve-hour shifts, or 24 hours per week, that error could also have impacted her findings.

could maintain this part-time work without the special circumstances that Mr. Paz provided to him.  (Tr. 339.)   As such, Mr. Paz presented probative and relevant evidence regarding the degree of Mr. Luna's functional limitations and the extent to which his mental impairments interfered with his ability to perform work independently, appropriately, effectively, and on a sustained basis.  *See* 20 C.F.R. § 416.920a.  Mr. Paz also presented probative and relevant evidence regarding the part-time work setting in which Mr. Luna functioned, the quality and level of his performance, and the amount of supervision or assistance he required.  *Id.* Therefore, it was error for the ALJ to ignore this evidence in both rating the degree of Mr. Luna's functional limitation and assessing Mr. Luna's RFC.   20 C.F.R. §§ 416.927(b), 416.945(c).

The ALJ failed to consider Mr. Paz's testimony pursuant to SSR 06-03p.  In considering evidence from "non-medical sources" who have not seen an individual in a professional capacity in connection with their impairments, such as an employer, an ALJ should consider such factors as the "nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."  SSR 06-03p, 2006 WL 2329939, *6.   Applying these factors here, Mr. Paz had been Mr. Luna's manager for approximately five months at the time he signed his affidavit (Tr. 339), and had witnessed Mr. Luna's limitations in an actual work setting.   Mr. Paz's testimony regarding Mr. Luna's difficulties with completing tasks, needing frequent reminders, and working at a slower than normal pace was consistent with Dr. May-Valencia's opinion that Mr. Luna's short term memory was poor and his ability to sustain attention, concentrate, and exert mental control was in the borderline range.  (Tr. 360, 362.)  Mr. Paz's testimony was also consistent with LISW Buchan's opinion that Mr. Luna had marked difficulties in concentration, persistence, and pace.  (Tr. 503.)

Mr. Paz's testimony, therefore, demonstrated the severity of Mr. Luna's difficulties in concentration, persistence and pace and how it affects his ability to function in the workplace. *See* SSR 06-03p, 2006 WL 2329939, at *2 and *3 (instructing that evidence from non-medical sources may be used to show the severity of an individual's impairments and how it affects the individual's ability to function). As such, it was error for the ALJ not to consider it pursuant to SSR 06-03p in assessing Mr. Luna's RFC.

Finally, the ALJ failed to consider whether Mr. Luna had the ability to work on a regular and continuing basis in light of Mr. Paz's testimony. *See* SSR 96-8p, 1996 WL 374184, at *7 (explaining that the ALJ must discuss a claimant's ability "to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.,* 8 hours a day, for 5 days a week, or an equivalent work schedule)" in assessing RFC). Mr. Paz testified that Mr. Luna experienced significant workplace challenges even while working only five hours a day for two days a week. (Tr. 339.) As such, Mr. Paz's testimony was directly relevant to the question of Mr. Luna's ability to work on a regular and continuing basis.[21] The ALJ failed to consider this question in assessing Mr. Luna's RFC. *See* SSR 96-8p, 1996 WL 374184, at *7.

Ignoring Mr. Paz's testimony was not harmless error because absent a valid reason to discount it, this evidence supports greater limitations than the ALJ assessed, is consistent with other evidence the ALJ ignored, and seriously undercuts the ALJ's conclusory rejection of LISW Buchan's assessment of marked limitations as "inconsistent with the weight of the evidence." The Court applies harmless error where the Court can "confidently say that no reasonable

---

[21] LISW Buchan assessed that Mr. Luna was markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and in his ability to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods. (Tr. 504.) Mr. Paz personally witnessed and attested to how a number of these limitations impacted Mr. Luna in the work environment, and notably, his experience was consistent with LISW Buchan's assessment.

administrative factfinder, following the correct analysis could have resolved the factual matter in any other way." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005). This, the Court cannot do here. Had the ALJ considered all of the evidence discussed herein that she either rejected or ignored, she may have properly resolved the factual matter differently.[22] The ALJ failed to apply the correct legal standards in considering Mr. Paz's testimony. This is reversible error.

For all of the foregoing reasons, the ALJ failed to apply the correct legal standards in assessing Mr. Luna's RFC as to his limitations in concentration, persistence and pace, and her RFC assessment is not supported by substantial evidence. "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen,* 436 F.3d at 1165.

### D.    The Court Will Remand for Additional Administrative Proceedings

Mr. Luna argues that the Commissioner's decision should be reversed for an immediate award of benefits. (Doc. 25 at 23.) The Court does not agree. District courts have discretion to

---

[22] In the Tenth Circuit, hypothetical questions to a vocational expert need only include those limitations that the ALJ finds are established by substantial evidence. *Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995). "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision." *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991). Because the ALJ failed to apply the correct legal standards in assessing Mr. Luna's RFC, the matter needs to be remanded for further proceeding. It is likely that after applying the correct legal standards on remand the RFC will be assessed differently necessitating a different hypothetical to the VE. For instance, while the ALJ's limitation to simple routine tasks with reasoning one level is insufficient to account for marked limitations in concentration, persistence and pace, this is sufficient to account for moderate limitations. "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere *seriously* with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P. app. 1, 12.00(C) (emphasis added). A reasoning level one job only addresses the general nature of Mr. Luna's education required for satisfactory job performance. *See* Dictionary of Occupational Titles*,* App. C  - Components of the Definition Trailer, 1991 WL 688702 (defining the general education development that is required for satisfactory job performance, including reasoning development). Thus, a reasoning one level would not address Mr. Luna's ability to perform sustained work activities in an ordinary work setting on a regular and continuous basis in the face of marked limitations in concentration, persistence and pace. Further, limiting Mr. Luna to simple routine tasks would also fail to account for marked limitations in concentration, persistence and pace. *See Chapo v. Astrue*, 682 F.3d 1285, 1290, n.3 (10th Cir. 2012) (noting that a restriction to "simple" work does not in all instances account for the effects of mental impairments); *compare Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2014) (unskilled jobs may adequately take into account *moderate* limitations in concentration, persistence, and pace).

remand either for further administrative proceedings or for an immediate award of benefits. *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993).  In making this decision, courts should consider both "the length of time the matter has been pending and whether or not 'given the available evidence, remand for additional fact-finding would serve [any] useful purpose but would merely delay the receipt of benefits.'"  *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (quoting *Harris v. Sec'y of Health & Human Servs.*, 821 F.2d 541, 545 (10th Cir. 1987)). This matter has not been pending for an unreasonable period of time.  Additionally, the Court is not persuaded that remand for additional fact-finding would merely delay the receipt of benefits. The Court is therefore remanding for additional administrative proceedings.

### E.   Remaining Issues

The Court will not address Mr. Luna's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## V.  Conclusion

For the reasons stated above, Mr. Luna's Motion to Reverse or Remand for Rehearing is **GRANTED.**

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**